# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00192-CR

**Thomas Hoffman, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF BELL COUNTY
### NO. 2C01-07229, HONORABLE GERALD M. BROWN, JUDGE PRESIDING

Appellant Thomas Hoffman was convicted after a bench trial of cruelty to animals, and punishment was assessed at ninety days= confinement, probated for one year, and a $500 fine. *See* Tex. Pen. Code Ann. ' 42.09 (West Supp. 2002).[1] The trial court found that Hoffman shot Harold Godwin=s dog on July 31, 2001. Hoffman appeals, contending the evidence is factually insufficient to support his conviction.[2] We will affirm.

---

[1] Section 42.09 was amended in 2001, but those changes do not affect this appeal. *See* Act of May 24, 2001, 77th Leg., R.S., ch. 450, ' 1, 2001 Tex. Gen. Laws 887, 887-88; Act of April 25, 2001, 77th Leg., R.S., ch. 54, ' 3, 2001 Tex. Gen. Laws 90, 95.

[2] Hoffman argues only that the evidence is factually insufficient, but concludes his brief by asking that this Court acquit him of the charges. Acquittal is appropriate only if the evidence is legally insufficient; when evidence is factually insufficient, we will reverse and remand for a new trial. *See Cantrell v. State*, 54 S.W.3d 41, 45 (Tex. App.CTexarkana 2001, no pet.).

Deputy Henry Albert of the Bell County Sheriff=s Office testified that in early August 2001, he was assigned to investigate the July 31 shooting of Godwin=s dog. Albert testified that when he first asked Hoffman Aabout shooting a dog,@ Hoffman Aasked me if I wanted to see them, which surprised me because I was only aware of one dog.@ Hoffman showed Albert the bodies of two dogs he had shot about one month earlier because they were on his property and attacking his chickens; Albert later learned that those dogs were not related to the incident involving Godwin=s dog. Hoffman told Albert that he had not shot any other dogs and that he had not been to Godwin=s property in over a year; Hoffman denied shooting a dog on July 31. Albert testified that Hoffman told him that on July 31 Godwin chased Hoffman as he drove down a road on his way into town.

Albert also interviewed Godwin, who had to be calmed down. Albert said:

> The first time I had talked to [Godwin], he had told me certain things on the phone and I asked him to come in and write a statement, and he came in and the statement he wrote did not match what he told me, and did not match what was in the report that [another deputy] took.

Albert testified that Godwin initially said that he saw Hoffman shoot the dog, but later said that he Asaw Mr. Hoffman=s truck, heard a shot, then saw Mr. Hoffman get in the truck and leave. Another time he told me he saw Mr. Hoffman turn around in his truck leaning out the window shooting back towards his property.@ Godwin=s handwritten statement was illegible, so Albert wrote down what Godwin told him and Godwin then signed the statement. In that statement, Godwin stated that he saw Hoffman parked near Godwin=s gate and Athen I heard gunshots and I seen him . . . turned around in his seat, firing onto his [sic] property. I hollered at him, and he took off. I drove down to my gate and 15 feet inside my gate was my dead dog.@

Deputy Joseph Bentley testified that he was dispatched to investigate the shooting of a dog on July 31; the call came in to the police dispatch center at 10:03 a.m. When he met with Godwin, Godwin had in the back of his pickup truck a dead dog that had been shot in the mouth by a small caliber gun, such as a rifle or pistol, not a shotgun. According to Bentley=s report written on July 31, Godwin said:

> [H]e observed a brown flatbed, believed to be a Dodge truck, parked on his property. He recognized the truck as belonging to an eccentric neighbor, Thomas Hoffman. About the time Godwin stopped his pickup, he heard a shot, the shot came from inside Godwin=s property. Then he said he further observed Hoffman . . . carrying some kind of gun, getting back into the truck as Hoffman sped away.

3

Godwin testified that on July 31, he left his property, locking his gate behind him. As he drove down his road, he passed Hoffman sitting in his Abig flatbed truck.@ Shortly thereafter, Godwin realized he had forgotten something, so he returned to see Hoffman=s truck backed up near Godwin=s gate. Godwin testified, AWhen I looked down there, he was turned around in the seat shooting on to my property. I heard a shot. He was turned around in the seat.@ Godwin said he yelled at Hoffman, and Hoffman then Atook off down the road past me going about . . . 70 in that big old truck. And it was jumping in the air. And he was hollering something at me, I couldn=t hear what he was saying, he was screaming like a maniac.@ When Godwin went to his property and opened the gate, he saw his dog lying dead on the ground. Godwin tried to call the police on his cellular phone but could not get through. He put his dog in his truck, and then called his wife to ask her to call the police. Godwin thought that the shooting happened at about 9:30 a.m., and that he called his wife about thirty minutes later. Godwin said the other two dogs that Hoffman admitted shooting were not his.

When asked why Bentley=s report described a brown truck, whereas Hoffman drove a white flatbed truck, Godwin said,

> I probably did [tell Bentley the truck was brown]. I was very excited. I=ll tell you this, I knew it was Mr. Hoffman=s truck. I don=t know the exact color of it, until you just showed me there, I wouldn=t be able to tell you the color. I never really paid any attention to what color his truck is. I know his truck when I see it. And I know Mr. Hoffman when I see him. I saw him.

Godwin also said that it was very dusty that day and that he probably thought the truck was brown because of the dust. Asked about the portion of Bentley=s report that said Godwin saw Hoffman Agetting into the

4

truck@and speeding away and that Godwin chased Hoffman down the road, Godwin said that was not what he told Bentley. Godwin testified that Albert and Bentley apparently misunderstood him when he tried to explain that Hoffman had been parked outside the gate, turned around inside his truck and shooting back toward Godwin=s property. He said he did not tell the deputies that he saw Hoffman parked near his property before the shooting because he did not think it was important, and he denied saying that he chased Hoffman after the shooting.

Godwin was asked, AIs there any doubt in your mind that Mr. Hoffman is the one that shot your dog?@ Godwin answered, ANo doubt in my mind whatsoever, sir. Not one bit.@

Hoffman, who drives a white flatbed truck, testified that on July 31, he went to a friend=s house at about 9:00 a.m. and stayed for about an hour. Hoffman testified that he did not shoot Godwin=s dog on July 31, and he denied telling the deputies that Godwin chased him down the road that morning. He said the two dogs he shot earlier were Godwin=s dogs, saying, AI knew they was his. I told him, I told everybody in the neighborhood I killed them dogs back in May for killing my chickens.@ Hoffman testified that he keeps a Asawed-off 12 gauge 00 Buck@ in his truck and keeps a shotgun and two rifles at his home.

Joan Shannon testified that Hoffman came to her son=s house on July 31. She could not recall when he arrived, but thought it was about 9:00 a.m. She did not know when he left, but he was still there Ain the proximity between 10 and 11.@ Joanne Shannon, Joan Shannon=s daughter-in-law, testified that Hoffman came to her house Aclose to 9@ and stayed for a Acouple hours@ on the morning of July 31.

5

When reviewing the factual sufficiency of the evidence, we ask whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the fact-finder=s determination. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Givens v. State*, 26 S.W.3d 739, 742 (Tex. App.CAustin 2000, pet. ref=d). We will reverse only when the record clearly indicates that the verdict is wrong and manifestly unjust. *Johnson*, 23 S.W.3d at 9. We may not set aside a verdict merely because we believe that another result is more reasonable. *Clewis v. State*, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996); *Givens*, 26 S.W.3d at 742. In a bench trial, the trial judge is the sole fact-finder and as such resolves any evidentiary conflicts, evaluates witness credibility, determines the weight to be given the evidence, and may accept all or any portion of a witness=s testimony. *Austin v. State*, 794 S.W.2d 408, 412 (Tex. App.CAustin 1990, pet. ref=d); *see Johnson*, 23 S.W.3d at 8-9.

Hoffman argues that A[t]he one thing Godwin was sure of was that the dog was killed at 9:30 a.m.,@ whereas Hoffman and the Shannons testified that Hoffman was at the Shannons=s house from about 9:00 until at least 10:00. However, a close review of the record shows that Godwin did not state with certainty that the shooting occurred at 9:30 or that his wife called the police thirty minutes later. Godwin said he thought the shooting happened at about 9:30 a.m., basing that assumption on the time he initially left his property, and he said that he probably called his wife about one-half hour later. Hoffman also contends that Godwin Agave at least three different versions of what had occurred,@ and points to inconsistencies between Godwin=s trial testimony and the deputies=reports. However, Godwin explained why he may have said the flatbed truck was brown and said that the deputies apparently misunderstood him

6

when he tried to explain what he saw, and Bentley said Godwin was very upset and had to be calmed down on the morning of the shooting. It was up to the trial court to evaluate the witnesses= credibility and demeanor and to resolve evidentiary conflicts. *See Austin*, 794 S.W.2d at 412. Although there are some inconsistencies in the evidence, we do not believe that the evidence supporting the trial court=s judgment is so obviously weak or outweighed by contrary proof as to undermine confidence in the court=s determination or that the record as a whole shows that the verdict is wrong and manifestly unjust. *Johnson*, 23 S.W.3d at 9, 11. We overrule Hoffman=s issue on appeal and affirm the trial court=s judgment.

_____

David Puryear, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed: August 8, 2002

Do Not Publish

7